1    **WO**

2

3

4

5

6                     IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Frederico Aguilar Murillo, et al.,        )    No. CV-07-2581-PHX-GMS
                                                )
10                  Plaintiffs,                 )    **FINDINGS OF FACT AND**
                                                )    **CONCLUSIONS OF LAW**
11   vs.                                        )
                                                )
12                                              )
     Servicios Agricolas Mex Inc., et al.,      )
13                                              )
                    Defendants.                 )
14                                              )
                                                )
15   _____

16          Pursuant to the agreement of the parties, the Court held a non-jury trial on Plaintiffs'

17   complaint on August 23-25, 30-31 and September 1-2, 2011.  The parties filed post-trial

18   memoranda on September 9, 2011.  Pursuant to Federal Rule of Civil Procedure 52, the

19   Court hereby makes its findings of fact and conclusions of law.[1]

20                            **FINDINGS OF FACT**

21          1.      Plaintiffs are 171 United States workers composed of nine United States

22   Citizens and 162 permanent legal residents of the United States.  Although they are legal

23   permanent residents of the United States, most of them reside in or around the area of San

24   Luis, Mexico and/or San Luis, Arizona.  Plaintiffs are harvest workers who worked for

25   Defendant Servicios Agricolas Mex, Inc. ("SAMI") during either the 2004-05 or 2005-06

26   _____

27          [1]On March 6, 2012 this Court received notice that Defendant Richard De Leon filed
     for bankruptcy.  The claims against him, therefore, are stayed pursuant to 11 U.S.C. § 362.
28

harvest seasons.  There is a great disparity among them in terms of the amount of time that they actually worked for SAMI during either or both of these seasons.

2.      Plaintiffs bring claims against Defendants for failing to employ them, or extend them offers of employment, during the 2006-07 citrus harvesting season that occurred in southwest and central Arizona.  Plaintiffs claim that such failures violated provisions of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") 29 U.S.C. § 1800 et seq (2009).

3.      In addition, the nine U.S. citizen Plaintiffs—Harold Appling, Arturo Salgado Bahena, Miguel Angel Rapan, Maria Miranda, Raul Garcia, Fenando Duarte Ochoa, Jose M. Segura Sandoval, Octavio Serrano and Gustavo Zerega Espinoza—bring § 1981 claims against the Defendants alleging that Defendants failed to hire them because they are U.S. Citizens.

4.      The Claims in the operative complaint are limited to the 2006-07 season.

5.      Defendant SAMI is a farm labor contractor.  It is an Arizona corporation, incorporated in 2004.  It is engaged in the business of providing farm harvesting services to agricultural producers, including citrus growers, in Arizona.

6.      Defendant Marlin Ranching Company ("Marlin Ranching") is an Arizona corporation incorporated in 1993.  It farms citrus and owns or leases land on which Plaintiffs picked lemons while they were employed with Defendants.

7.      Defendant Marlin Growers Inc. ("Marlin Growers") is an Arizona corporation and non-profit agricultural cooperative incorporated in 1988 having as its members persons or entities who grow citrus.

8.      A citrus harvest season in Arizona extends from approximately late August or early September of one year to late February or early March of the following year, with pruning and related practices occurring thereafter.

9.      After the discontinuation of the bracero program in the late 1960s, distinct patterns began to emerge for hiring agricultural workers in central and western Arizona for harvesting the annual citrus crop.

10.     Yuma County, in western Arizona, adjusted to the loss of the bracero program by becoming mostly able, over time,  to provide sufficient domestic workers for citrus harvesting in the Yuma Valley area.  Such seasonal agricultural workers are either United States citizens or permanent legal residents who live in or around San Luis, Mexico or San Luis, Arizona.

11.     Companies and farm labor contractors that wish to recruit seasonal agricultural workers in San Luis generally do so at the corralons located there.  Corralons are garages in San Luis with associated parking lots in which farm labor contractors recruit workers and store their buses.  The buses are used for the daily transportation of the farm laborers to the fields they will be harvesting during harvest season.

12.     Each farm labor contractor's corralon is generally located in the same area of San Luis. For a few days prior to the date on which the citrus harvest begins, those companies renting corralon space will park their buses outside of their respective corralon.  The parking of the buses outside the corralon is a signal to the residents of the area that the harvesting season is about to begin.  The various contractors' foremen will generally be at the corralon or at the border attempting to recruit harvest workers at this time.

13.     While a number of workers will return to work for the same foreman and the same farm labor contractor during successive harvest seasons, there is considerable turnover in the workers that make up a foreman's crew both during the same harvest season, and from year to year.

14.     During the course of the same harvest season workers on a crew may choose to work more or fewer days, change the foreman for whom they work, or change companies. A foreman may decide to change the farm labor contractor for whom he and his crew work.  Because both workers and foremen are paid bonuses based on productivity, there is a desire to work for a good company and a good foreman in fields that will be productive.

15.     Those workers wanting to work in the harvest that have not already agreed to work for a particular foreman or who wish to change the crew for which they work, report to the corralons and sign up to work for a foreman, or make other arrangements separately

with a foreman.  New workers are employed at the corralon throughout the duration of the harvest season.

16.    Workers are recruited at the corralons in San Luis to harvest fields in the Yuma Valley area, including Bard, California.  They are typically transported by their employer from the corralon in San Luis to the harvest fields in Yuma Valley and back again to San Luis.

17.    Although a number of seasonal agricultural workers hired themselves out to work in Yuma Valley from the corralons at San Luis, there were historical shortages of adequate U.S. farm workers to accomplish the citrus harvest in the more central parts of Arizona including White Wing, which is close to Dateland, Arizona, and in Maricopa and Pinal counties.  These locations are a lengthy commute from San Luis.  A one-way commute by bus between San Luis and White Wing, the closest location, takes between two to three hours.

18.    Prior to the 2006-07 harvest season, citrus growers in Maricopa and Pinal counties had  relied on the H-2A program[2] to recruit authorized Mexican workers to obtain sufficient workers to harvest their annual citrus crop when they could not otherwise obtain sufficient U.S. workers.

19.    The H-2A program regulates the importation of non-resident temporary alien agricultural workers.  The program regulations are designed to protect the employment and working conditions of citizens or permanent legal residents of the United States while enabling employers to hire foreign workers when sufficient domestic employees are unavailable.

20.    The Marlin entities had fields to harvest in the Yuma Valley, at White Wing and in Maricopa and Pinal counties.

21.    Prior to the 2002-03 harvest season, William Chaney, the President of the

_____

[2]Immigration and Nationality Act of 1952 § 101(a)(15)(H)(ii)(a), codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

1   Marlin entities, called Ralph De Leon and determined that he and his company Servicios
2   Agricola Mexicano ("SAMCO") would be interested in providing farm labor contracting
3   services in Arizona for the Marlin entities.

4           22.     SAMCO is no longer a Defendant in this action.

5           23.     At the time, Ralph De Leon's son Richard was a management employee at
6   SAMCO, but he was principally involved in SAMCO's California operations.

7           24.     In the 2002-03 harvest season the Marlin entities employed SAMCO to harvest
8   their citrus crop.  SAMCO recruited workers at the corralon in San Luis to work the Yuma
9   Valley fields.  It is not apparent to the Court based upon the evidence provided whether
10  SAMCO obtained authorization to use H-2A workers to harvest the groves in central Arizona
11  during the 02-03 season.

12          25.     In 2003-04, the Marlin entities again contracted with SAMCO for purposes of
13  obtaining their farm labor.  Prior to the beginning of this harvest season, SAMCO made an
14  application to the United States Department of Labor for approval to bring in 200 Mexican
15  H-2A workers to harvest Marlin's fields at 98500 Palomas Rd. in Dateland, Arizona (White
16  Wing).

17          26.     The H-2A application was filled out and presented to the Department of Labor
18  by William Marrs—SAMCO's attorney.

19          27.     Although SAMCO requested 200 H-2A workers, the Department through
20  Arizona's designated workforce agency determined that the barracks at White Wing only had
21  sufficient space to house 150 alien workers. Thus, on August 6, 2003, SAMCO's application
22  was approved but for only 150 H-2A workers.  The approval was subject to SAMCO's
23  assurances made in the application process.

24          28.     In 2004, Ralph De Leon's wife became seriously ill requiring much more of
25  his attention. As a result, his son Richard became more involved in SAMCO's Arizona
26  operations.

27          29.     Subsequently, after discussions with his father, Richard formed his own farm
28  labor contracting company—SAMI.

1    30.    During the 2004-05 season the Marlin companies contracted with both SAMI

2  and SAMCO to accomplish their citrus harvesting.  SAMI took over SAMCO's operations

3  with respect to the citrus harvesting in Yuma Valley and in Bard, California  and the related

4  transportation of workers to the orchards from the corralon at San Luis.  SAMCO continued

5  to harvest the orchards in central Arizona using the authorized H-2A workers that it housed

6  at Marlin's barracks at White Wing.

7    31.    Because SAMI was, in effect, replacing SAMCO in its operations in the Yuma

8  Valley, Richard De Leon and other SAMI management employees held a breakfast meeting

9  at the San Luis McDonalds, prior to the commencement of the 04-05 season, with the

10 foremen that had previously worked for SAMCO in the Yuma Valley area.  The meeting was

11 to inform them of the season's approximate start date and to determine whether the foremen

12 who had worked for SAMCO the previous harvest season would be returning with their

13 crews to work for SAMI.

14    32.    Oscar Agauyo Sr. and Oscar Agauyo Jr., who had been supervisors for

15 SAMCO, came to work as supervisors for SAMI.  Jose Castano, who had been a foreman for

16 SAMCO in the 03-04 season, became a supervisor for SAMI in the 04-05, and 05-06 harvest

17 seasons.  He reported to Oscar Agauyo Sr.

18    33.    Leobardo Aguirre, Jose Gonzales, Humberto Gaxiola, and Julio Cesar De La

19 Rocha had also worked for SAMCO, and its predecessor C&F, and became foremen for

20 SAMI in 04-05.   These foreman either recruited their past workers, or, to the extent it was

21 necessary or desirable, recruited new workers at the corralon at San Luis for SAMI.

22    34.    SAMI management understood that it was after this McDonald's meeting or

23 other initial contact with the foremen that the foremen began re-assembling their former

24 crews and recruiting new crew members for the ensuing harvesting season.

25    35.    Prior to the beginning of the 04-05 harvest season, the Department of

26 Economic Security sent out notices to the Yuma Valley workers who had worked for

27 SAMCO during the 03-04 harvest season who were receiving unemployment benefits.  The

28 notices informed them of the date on which the 04-05 harvest season would begin and

1  directed them to report for work if they desired to remain eligible for unemployment benefits.
2  Richard De Leon acknowledges that SAMI would have benefitted from this notice to
3  previous SAMCO workers by obtaining a greater number of workers from San Luis to
4  harvest in Yuma Valley.

5        36.    Because SAMCO, not SAMI, kept that part of the Marlin harvesting that used
6  H-2A employees, SAMCO again requested the Department of Labor to certify 150 H-2A
7  workers to reside at White Wing, and Buckeye to harvest Marlin's orchards in central
8  Arizona.  This 04-05 harvest season SAMCO's application indicated that the workers were
9  to harvest 640 acres in Dateland (White Wing), 800 acres in Eloy, 80 acres in Maricopa, 320
10  acres in Surprise, and 12 acres in Phoenix.  SAMCO proposed to provide housing at its
11  barracks locations both in White Wing and in Buckeye.

12        37.    Again, the application was filled out and presented to the Department of Labor
13  by William Marrs—SAMCO's attorney.

14        38.    SAMCO also sent to the Department two form letters that it had sent to the two
15  U.S. employees who worked the previous year at White Wing informing those two workers
16  that the same employment at White Wing would be available and to call if they were
17  interested in such work.  Similarly SAMCO sent proof that it ran radio ads recruiting U.S.
18  workers and further provided two newspaper solicitations that it had taken out in a local
19  newspaper soliciting 150 citrus workers to work at White Wing.

20        39.    SAMCO's application for 150 H-2A workers was approved and those workers
21  harvested Marlin's central Arizona orchards in 04-05.  The approval was again subject to the
22  fulfillment of the assurances made by SAMCO in the application process.

23        40.    During the 05-06 season, the Marlin companies again contracted with both
24  SAMI and SAMCO.  SAMI and SAMCO continued to split the work as described above.
25  Thus, during the 05-06 season, SAMI again conducted that part of Marlin's harvest that
26  transported workers from the corralon at San Luis to harvest fields principally in the Yuma
27  Valley.

28        41.    Again, Richard De Leon and other management employees held a breakfast

1   meeting at the San Luis McDonalds just prior to the harvest, to determine whether the
2   foremen who had worked for SAMI the previous harvest season would be returning to work
3   for SAMI.  Aguirre, Castano, De La Rocha, Gaxiola, and Gonzalez all returned to work for
4   SAMI in the 05-06 season.

5          42.    Because during the 05-06 harvesting season SAMCO again kept that part of
6   the Marlin harvesting that used H-2A employees, SAMCO sought and received certification
7   for approximately 100 H-2A workers to harvest specified acreage throughout the state prior
8   to the beginning of the harvest.  That year, however, in addition to seeking H-2A workers to
9   harvest 640 acres of citrus groves at White Wing, 800 acres in Eloy, and 80 acres in
10  Maricopa, SAMCO sought approval to use H-2A workers to harvest 300 acres in the Yuma
11  Valley.  Those 300 acres were specifically identified as being at County Road 14 and 6E and
12  County Road 13 and 6E.  SAMCO only proposed to house the workers at the barracks in
13  White Wing.

14         43.    Again, the application was filled out and presented to the Department of Labor
15  by William Marrs—SAMCO's attorney.

16         44.    SAMCO sent to the Department proof that it ran radio ads recruiting U.S.
17  workers and further provided two newspaper solicitations that it had taken out in Spanish in
18  a local newspaper soliciting citrus workers to work at White Wing. It does not appear from
19  the exhibits submitted that any U.S. workers had worked for SAMCO the previous year at
20  White Wing.

21         45.    SAMCO's application for 100 H-2A workers was approved.  The application
22  specifically approved workers to harvest not only in Dateland, Eloy and Maricopa but also
23  in Yuma, Arizona.   The approval was again subject to SAMCO's assurances made in the
24  application process.

25          46.    Marlin had between 1000-1600 acres in citrus groves in the Yuma Valley in
26  the 05-06 harvest season. Evidence offered suggests that after that season, Marlin began to
27  sell its property in the Yuma Valley area due to the housing boom and the age of the citrus
28  groves.

1      47.    Ralph De Leon decided to retire in 2006 and to terminate the operations of

2  SAMCO.  Upon being informed of Ralph's decision, William Chaney, the director of the

3  Marlin entities,  asked SAMI and Richard De Leon if it wanted to pick up the central Arizona

4  harvesting operations previously performed by SAMCO and his father.  SAMI determined

5  that it would do so.

6      48.    For the 06-07 harvest season SAMI was paid on a cost-plus basis by Marlin.

7  Marlin payed SAMI its labor cost plus an overhead of 42.5%.

8      49.    On June 19, 2006, SAMI filed its application for temporary labor certification

9  with the U.S. Department of Labor for 150 H-2A workers to be employed as fruit harvest

10  workers from August 15, 2006 through March 31, 2007.   The application was filled out by

11  the same attorney, William Marrs, that had previously represented SAMCO and was now

12  representing SAMI.  The workers were again to be housed in the barracks at White Wing.

13  The application  described the need for H-2A workers to work the same number of acres and

14  in the same locations, including the same 300 acres in Yuma, as had previously been

15  requested and approved for SAMCO in the 05-06 harvest season.  SAMI made the same

16  assurances as did SAMCO and followed the same procedures dictated by the Department of

17  Labor and the Arizona Department of Economic Security in submitting its application.

18      50.    The designated certifying officer with respect to SAMI's 06-07 application was

19  Marie C. Gonzalez. On June 27, 2006, the U.S. Department of Labor, through Ms. Gonzalez,

20  determined that SAMI's application contained conditions of employment that "will not

21  adversely affect U.S. worker's similarly employed."  Ms. Gonzalez directed SAMI to

22  continue to cooperate with Arizona Workforce Connections to recruit workers, take

23  interviews, and document the interviews.  In addition to running the specified newspaper

24  advertisements containing specific details of the job offer, Ms. Gonzalez required SAMI to

25  also run at least one radio ad containing the details of the offer.  Further in terms of

26  complying with the assurance that SAMI would contact "qualified workers in other areas of

27  the State and/or nation by letter and/or by telephone," Ms. Gonzalez directed SAMI to

28  "contact former U.S. employees, and solicit their return to the job.  All actions and responses

1  should be documented."

2       51.    Defendants in certain respects exceeded the requirements of Ms. Gonzales.

3  They ran Spanish and English advertisements on a local radio station and in local Yuma area

4  newspapers seeking to recruit workers to work from their White Wing facility. Despite the

5  requirement that they run a single radio ad, they ran two. Further, the state job service

6  solicited workers for the job opportunities at White Wing and set up job interviews with

7  SAMI for potential employees on pre-set dates. Although potential U.S. candidates set

8  appointments for job interviews with SAMI, only one of the job candidates presented himself

9  for the interview, and no U.S. candidates were hired to work at White Wing for the 06-07

10  harvest season.

11       52.    SAMI did not mail any letters of recruitment to former U.S. employees

12  advertising the positions. SAMI had not previously housed workers at White Wing and thus

13  had not previously hired former U.S. migratory agricultural employees who had worked from

14  White Wing. An inadequate response was received from the advertisements and the state job

15  service agency recruitment to fill the positions needed by SAMI.

16       53.    On July 14, 2006 Ms. Gonzalez granted SAMI the certification to employ 150

17  H-2A workers at White Wing. That certification specifically authorized work in the Yuma

18  fields specified in the application. It, too, was granted "subject to the conditions and

19  assurances made during the application process."

20       54.    The base of Defendant SAMI's harvest operation during the 06-07 harvest

21  season was switched to White Wing, Arizona, a location at least 90 miles to the east of San

22  Luis. Single residential barracks at White Wing were used to house and feed workers. The

23  vast majority of these workers, if not all of them, were H-2A workers approved and certified

24  by the Department of Labor. When groves other than White Wing were to be harvested,

25  SAMI transported its harvest workers to those groves including groves at Eloy, Maricopa,

26  and in the Yuma Valley. At the end of the day the workers were transported from the groves

27  back to White Wing by SAMI.

28       55.    SAMI conducted no operations in the 06-07 harvest season from the corralons

1   in San Luis.  SAMI provided no transport from its former San Luis corralon to any of the
2   groves to be harvested during the 06-07 harvest season.

3        56.    Richard De Leon testified that he made this decision to stop operations from
4   the San Luis corralon because when SAMI held its annual meeting at the McDonald's in San
5   Luis prior to the 06-07 season, only two of the five foremen from SAMI's previous season,
6   Leobardo Aguirre and Julio De La Rocha, appeared.  Absent were Jose Castano, Jose
7   Gonzales and Humberto Gaxiola.  Mr. De Leon testified that he was told by Oscar Aguayo
8   Jr., who he relied on to set up the meeting, that Aguayo could not contact Mr. Castano.  Mr.
9   Aguayo also apparently told Mr. De Leon that he had heard that Jose Gonzalez and
10  Humberto Gaxiola were going to work for Yuma Mesa—a competing farm labor contractor.

11       57.    Although Mr. De Leon knew that in the past the foremen began to reassemble
12  their crews after the annual meeting at the McDonalds in San Luis, he did not tell Mr.
13  Aguirre, or Mr. De La Rocha at the McDonald's meeting either to assemble or not to
14  assemble their crews.  SAMI eventually hired Mr. Aguirre and Mr. De La Rocha during the
15  06-07 harvest season to supervise the H-2A crews at White Wing.  Neither Mr. Aguirre nor
16  Mr. De La Rocha affirmatively recruited any of their former crew members to work for
17  SAMI for the 06-07 harvest season.

18       58.    No testimony suggested that SAMI made any further effort to contact Mr.
19  Gonzalez or Mr. Gaxiola to confirm whether they would be working elsewhere.  Both
20  testified that they were unaware of any McDonald's meeting being held prior to the 06-07
21  harvest season.  Foreman Jose Gonzalez acknowledged in his testimony that he was never
22  promised work by SAMI prior to the 06-07 season. When his crew members made inquiry
23  that year, he told them that he did not get called by SAMI.  He did not tell them why because
24  he did not know why.  He was not promised employment by SAMI, he just expected it would
25  happen.

26       59.    Foreman Humberto Gaxiola testified that during his previous employment for
27  SAMI, Oscar Aguayo would contact him a week or two before the season was to start and
28  confirm employment of his crew for that season.  After he was contacted by Aguayo, Gaxiola

1   would begin contacting those who worked for him, and recruiting new workers if necessary.

2   In the 06-07 season, Gaxiola was never contacted by Aguayo or SAMI, and so he did not

3   contact his crew.  That year, when members of his crew asked him when they were starting

4   he told them he had not been contacted by SAMI.  When other companies started working

5   that season, he went to work for another company.

6       60.     Prior to making its decision to base its operations uniquely out of White Wing,

7   SAMI did recruit at least one San Luis based crew.

8       61.     SAMI, through Richard De Leon, arranged for a meeting with Mr. Castano at

9   a gas station in which he extended employment to Mr. Castano's crew for the 06-07 season.

10  Mr. Castano testified that he thereafter went out and recruited his crew, informing them that

11  they would be employed by SAMI.  After his meeting with Mr. Castano, Mr. De Leon

12  determined that SAMI would not actively recruit, employ or transport San-Luis based crews

13  to harvest the groves  in Yuma Valley or elsewhere.  Despite these new determinations, Mr.

14  De Leon  never had any subsequent conversations with Mr. Castano to inform him that

15  SAMI would not be employing his crew, or that his crew would have to either reside at

16  White Wing (free of charge) or arrange to travel there on a daily basis.

17      62.     According to Mr. Castano, when it became clear that SAMI would not be

18  hiring his crew or transporting them to groves from the San Luis corralon, most of his crew

19  subsequently obtained work with another farm labor contractor, Border Harvesting, for the

20  06-07 season.   Nevertheless, due to their earlier erroneous belief that they would be

21  employed by SAMI, and the later start by other farm labor contractors, they started such

22  employment approximately two weeks after SAMI began harvesting.

23      63.     Harold Appling testified that sometime in July of 2006 Oscar Aguayo Jr. told

24  him that harvest season would begin about September 10th in the 06-07 harvest year.  He

25  accordingly showed up at the corralon about that time and, when he discovered that SAMI

26  was not hiring, it took him between a week and two weeks to get a different job with another

27  harvester.

28      64.     During the 06-07 harvest season, SAMI brought the H-2A workers that it

1  employed through the port of entry at San Luis and had buses available at a public parking

2  lot close to the border in San Luis to transport the H-2A workers to White Wing.

3      65.    Cornelio Nunez-Gonzalez testified that when he witnessed this he approached

4  his previous foreman, Leobardo Aguirre, and "asked him for my job."  He was referred by

5  Mr. Aguirre to Richard De Leon, who indicated to him that SAMI would not be hiring

6  workers from the "San Luis" area this season.  Mr. Nunez testified that he was upset that

7  SAMI was hiring foreign workers to do the work he had done in the past.

8      66.    Pedro Lubiano-Cisneros testified that he asked his previous foreman, Julio

9  Cesar De La Rocha, for a job when he was in front of the bus picking up workers in the 06-

10 07 season.  The more credible evidence, however, demonstrates that Mr. Lubiano-Cisneros

11 had not worked for Julio Cesar De La Rocha in the past, had not worked for SAMI in the

12 previous year, had never done extensive work for SAMI, and was already under the employ

13 of a different harvester for the 06-07 harvest season.  The Court, thus does not find credible

14 Mr. Lubiano-Cisneros's testimony that he applied for a White Wing job from SAMI during

15 the 06-07 harvest season.

16      67.    Alejandro Duarte said he asked Salvador Covarrubias for a job at the border

17 when they were importing H-2As.  "Salvador was there and I asked him for work personally.

18 But his answer was the same: that only contract workers will be working."   Nevertheless,

19 the court does not find this testimony credible. Alejandro testified that he wanted to go back

20 to work for SAMI. Yet the submitted documentary evidence demonstrates that Alejandro had

21 only worked for SAMI for very short periods in the past and he testified that he already had

22 a new job.

23      68.    Raul Garcia Almeida testified that Oscar Agauyo Jr. was waiting at SAMI's

24 corralon to instruct workers that SAMI was not hiring.  Octavio Serrano, who was in the

25 courtroom during  Mr. Almeida's testimony, testified that he had a similar discussion with

26 Leobardo Aguirre who was waiting at SAMI's corralon to instruct workers that SAMI was

27 not hiring.  Gabriel Vargas, said that Oscar Agauyo Sr. was waiting at SAMI's corralon to

28 instruct workers that SAMI was not hiring.  Nevertheless, the Court does not find this

1   testimony credible because SAMI did not rent a corralon for the 06-07 harvest season. Since

2   it did not lease a corralon at San Luis, the Court finds it incredible that Defendants

3   supervisors and foremen were waiting there solely for the purpose of telling Plaintiffs that

4   they would not be rehired.

5       69.   Although there was testimony at trial that Plaintiffs would have been willing

6   to take a harvesting job at White Wing and either reside in the barracks there or pay for their

7   own daily commute, the Court does not find such testimony credible. The testimony was that

8   it takes between two to three hours one-way to commute from San Luis to White Wing,

9   depending upon whether the transport is by car or by bus. There was credible testimony that

10  San Luis workers would not go to White Wing for jobs. Further, employees such as

11  Plaintiffs who lost their previous positions working for one farm labor contractor operating

12  out of the San Luis corralons were able to relatively quickly find another harvesting job there

13  that would not entail relocation to White Wing. Finally, in their responses to interrogatories

14  most of the Plaintiffs indicated they had formed no intent to work at White Wing during the

15  06-07 harvest season at the time they answered their interrogatories, suggesting that such

16  intent was formed after the initiation of this claim.

17      70.   Although there was evidence presented at trial that a number of years before

18  the 06-07 harvest season a few of the Plaintiffs who now live at San Luis had done isolated

19  work at White Wing, and even stayed at the barracks during short periods, there was no

20  credible evidence that suggested that there was a custom or practice in 06-07 or in at least

21  several years preceding it, of recruiting agricultural workers at the San Luis corralons to

22  reside and/or work the harvest season in the barracks at White Wing.

23      71.   On February 9, 2007, still during the harvest season, Plaintiffs filed a charge

24  of employment discrimination under 8 U.S.C. § 1324b with the United States Department

25  of Justice based on SAMI's employment of H-2A workers. Plaintiffs withdrew the charge

26  on September 7, 2007. This charge against SAMI was then dismissed by the Department of

27  Justice.

28

1

**CONCLUSIONS OF LAW**

2   Plaintiffs assert that, among other things, Defendants' failure to comply with the

3   regulatory requirements of the H-2A program evidences Defendants' intent to discriminate

4   against the nine U.S. citizen Plaintiffs that bring the § 1981 claim.  Plaintiffs also claim that

5   the regulatory requirements of the H-2A program either constitute an enforceable "working

6   arrangement" between Plaintiffs and Defendants under the AWPA, or have been by law

7   incorporated into the contracts between Defendants and Plaintiffs as explicit provisions of

8   those contracts.  In either case, Plaintiffs contend that any violation of the H-2A program

9   regulations constitutes a violation of the AWPA as to all 171 Plaintiffs.

10   **I.    The H-2A Program**

11   The H-2A program allows an employer who anticipates a shortage of available U.S.

12   workers to apply to the United States Department of Labor for certification to bring into the

13   country a certain number of temporary, non-immigrant foreign workers to accomplish

14   specified labor during specified periods. Employers anticipating the need for H-2A workers

15   are required to submit applications containing detailed information, including specifying the

16   work to be done, its location, the anticipated period of the employment, the number of

17   workers necessary to accomplish the labor, and the terms of the proposed employment. The

18   application must also include an agreement to abide by the assurances required by the

19   regulations pertaining to the recruitment of U.S. workers. *See, e.g.,* 20 C.F.R. §§ 655.101(b),

20   655.102(d) (2006).[3]  These assurances are set forth in 20 C.F.R. § 655.103(d), (e) and (f).

21   The requirements set forth in 20 C.F.R. § 655.103(d)(4), which is the regulation principally

22   at issue, include cooperating with and assisting the state employment agency (in this case

23   the Department of Economic Security ("DES")) in publicizing the job opportunities, taking

24   referrals for candidates, being available to provide interviews for such candidates, running

25   advertisements with specified information in the newspapers, and contacting "qualified

26

27   [3]Unless otherwise stated the text of all regulations cited is from the April 2006 version
of the Code of Federal Regulations (C.F.R.) Which was the version fo the regulations in
28   place at the time of the events at issue here.

- 15 -

1   workers in other areas of the State and/or nation by letter and/or by telephone."

2         The application must be submitted at least 45 days prior to the time that the employer

3   needs H-2A workers. *Id.* at § 655.101(c). It must also be filed with DES which will also

4   recruit any U.S. workers who may be willing to accept the offered employment. *Id., see also*

5   *Id.* at § 655.104.

6         Certifying officers within the Department of Labor are required to conduct an initial

7   review of the application within seven days of its submission to determine if it contains

8   sufficient complying information to be "accepted for consideration and [whether] it meets

9   the regulatory standards." *Id.* at § 655.101(c)(2), *see also* 655.100(a)(4). If the certifying

10  officer determines that the application thus qualifies, the Department of Labor issues notice

11  to the employer to that effect. *Id.* at §§ 655.101(c)(2), 655.104(b). Among other things, the

12  notice  informs the employer of the specific efforts it must make while the application is

13  being considered "to carry out the assurances contained in § 655.103 with respect to the

14  recruitment of U.S. workers." 20 C.F.R. § 655.105 (a). In formulating those requirements,

15  the certifying officer considers any information she or he may receive from others "that there

16  are a significant number of able and qualified U.S. workers who, if recruited, would likely

17  be willing to make themselves available for work at the time and place needed." *Id.*  In

18  making this determination the certifying officer "shall take into account other recent

19  recruiting efforts in those areas and will attempt to avoid requiring employers to futilely

20  recruit in areas where there are a significant number of local employers recruiting for U.S.

21  workers for the same types of occupations." *Id.*

22        Thereafter, the certifying officer provides "overall direction to the employer and the

23  State agency with respect to the recruitment of U.S. workers." *Id.* at § 655.105(b). Based

24  upon the success of the employer and the state agency in recruiting applicants for the

25  position, the certifying officer must determine within twenty days prior to the time when the

26  work is to begin whether to grant or deny the application, in whole or in part. *Id.* at §

27  655.105(d). Applications are to be granted if the certifying officer "has determined that the

28  employer has complied with the recruitment assurances and the adverse effect criteria . . . by

1  the date specified." *Id.* at § 655.106(b)(1).

2      To further protect U.S. workers, once an application has been granted, program

3  regulations require an employer to hire any qualified U.S. workers who apply for the same

4  employment performed by the H-2A workers during the first 50 percent of the term of the

5  H-2A contract. *Id.* at § 655.103(e).

6      Further, the H-2A regulations set forth administrative remedies for those instances in

7  which an H-2A application involves possible fraud or material misrepresentation. *Id.* at §

8  655.108. There are additional administrative remedies provided when, after an application

9  has been granted,  the certifying officer "has reason to believe that an employer violated a

10  material term or condition of the H-2A certification." *Id.* at § 655.110 These administrative

11  procedures provide for investigation, hearing, and classification of the extent of violation,

12  and for penalties, including the employer's disqualification from consideration for H-2A

13  workers in the following years. *Id.*

14  **II.    Discrimination Claim (42 U.S.C. § 1981)**

15      To prevail on their § 1981 claim, the nine Plaintiffs bringing this claim must

16  demonstrate that it is more probable than not that the Defendants intentionally discriminated

17  against them because they are United States citizens. *See, e.g., Robinson v. Adams,* 847 F.2d

18  1315, 1316 (9th Cir. 1987), *cert. denied,* 490 U.S. 1105 (1989); *Craig. v. Los Angeles Cnty.,*

19  626 F.2d 659, 668 (9th Cir. 1980), *cert. denied,* 450 U.S. 919 (1981).  Plaintiffs have not met

20  that burden.

21      The Court finds it more likely than not that Plaintiffs were not hired for the positions

22  at White Wing because they did not apply for employment there.  Plaintiffs may have

23  refrained from applying for work at White Wing either because they were not aware of the

24  availability of such work, or because they believed that seasonal agricultural work which

25  would allow them to live in their own homes would be made available for the 06-07 harvest

26  season at the corralons at San Luis, through SAMI or otherwise.  The fact that such work was

27  not provided by SAMI does not constitute intentional discrimination by the Defendants

28  against the nine U.S. citizen Plaintiffs, especially when such work was advertised and

1   Plaintiffs did not apply for it.

2          The workers that SAMI hired and transported from the corralon at San Luis to the

3   groves to be harvested in Yuma Valley during the 04-05 and 05-06 harvest seasons, including

4   all 171 Plaintiffs,   were, by definition, seasonal agricultural workers. A "'seasonal

5   agricultural worker' . . . is not required to be absent overnight from his permanent place of

6   residence" 29 U.S.C. § 1802(10)(A).[4]

7          The terms of the only employment offered by SAMI during the 06-07 harvest season,

8   however, included housing at, and work based from, White Wing, which was at least 90

9   miles away from San Luis. The standard terms of employment thus offered room and board,

10  and contemplated neither the SAMI employees being able to live at home, nor SAMI

11  providing daily transportation from San Luis to the fields to be harvested or to White Wing

12         During the previous seasons from 03-04 through 06-07, none of the Plaintiffs applied

13  for or sought work at White Wing. Plaintiffs all lived within the area in which the migratory

14  farm work available at White Wing had been advertised both by radio and in the newspaper

15  as well as through the state job service recruitment. Credible testimony at trial established

16  that at least some, if not all, workers recruited at the corralon at San Luis would not live in

17  the housing at White Wing and work from there. None of the § 1981 Plaintiffs responded to

18  such advertisements or sought employment in which they would have been situated out of

19  White Wing. They were aware that H-2A workers harvested from White Wing during the

20  citrus harvest season.

21         Further, owners of citrus groves in central Arizona did not recruit harvest workers at

22  the corralons at San Luis for a number of years preceding the 06-07 harvest season. This is

23  because available workers do not come to the corralons at San Luis to be recruited until the

24  employers indicate that the harvest season is about to start. And employers for fields in

25  _____

26         [4]By contrast, a "migrant agricultural worker" is, among other things "required to be
    absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). H-2A
27  workers are separately regulated and, by definition, are excluded from being either seasonal
28  or agricultural workers. 29 U.S.C. § 1802(8)(B)(ii) & (10)(B)(iii).

1  central Arizona need to identify the workers willing to work their fields well before the

2  beginning of harvest season to determine whether they may, pursuant to regulatory

3  requirements, import H-2A workers to harvest their groves.  As a result, it was not practical

4  for U.S. employers with fields in central Arizona to wait until the beginning of harvest season

5  to recruit at the San Luis corralons for harvest workers.

6        For the 06-07 harvest season Defendants actively recruited U.S. workers to accept the

7  positions offered at White Wing in the way that SAMCO had done in the previous three

8  years.  Defendant SAMI ran radio spots and newspaper advertisements in the Yuma  area

9  advertising the positions and describing the terms on which such employment would be

10  offered. The seasonal agricultural workers previously employed by SAMI, who are Plaintiffs

11  here, all lived within the area in which the migratory farm work available at White Wing had

12  been advertised both by radio and in the newspaper as well as through the state job service

13  recruitment.  None of them responded to such advertisements.

14        Arizona Work Connections recruited and set up job interviews for candidates with

15  SAMI for the White Wing employment at pre-appointed times and locations.  In the absence

16  of sufficient workers applying for the White Wing based employment, the Department of

17  Labor authorized SAMI to employ 150 H-2A workers to be housed at White Wing.   In

18  following this process SAMI merely followed the same recruitment procedure  to hire

19  roughly the same number of H-2A workers to work and reside in the same location as had

20  its predecessor SAMCO  for the previous three years.  SAMI did so with the active

21  participation and authorization of both the U.S. Department of Labor and Arizona's

22  Department of Economic Security.

23        Defendants do not need to do more than this to refute the argument that they had

24  discriminatory intent in failing to hire the § 1981 Plaintiffs in this case for the 06-07 harvest

25  season.

26        Plaintiffs assert that Defendants' discriminatory intent is nevertheless established by

27  their failure to comply with the requirement set forth in the acceptance letter sent to

28  Defendants by the Department of Labor on June 27, 2006.  In that acceptance letter, the

1    Department of Labor instructed SAMI to "Contact former U.S. employees, and solicit their

2    return to the job."  But, while SAMI had previously employed seasonal agricultural workers

3    at the corralons in San Luis, SAMI had never previously employed migratory agricultural

4    workers who lived and worked out of White Wing.  SAMI's seasonal agricultural workers

5    at San Luis did not constitute former migrant farm workers from White Wing.  There were,

6    therefore, no former U.S. employees for SAMI to solicit "to return to th[at] job."  Because

7    SAMI was a first time applicant for H-2A workers in Arizona, the Department of Labor

8    certifying officer would have had a rational basis to certify SAMI's H-2A request.

9         Plaintiffs also argue that Defendants' assertion that it decided to change its operational

10   hub to White Wing in 06-07 is not worthy of credence because it is inconsistent with

11   Defendants' testimony at trial that they decided to quit their operations out of the San Luis

12   corralon only after three of their five foremen did not show up at the at the MacDonald's in

13   San Luis for the meeting prior to the 06-07 harvest season.

14        A number of facts are uncontested, however.  First, it is uncontested that the 06-07

15   harvest season was the first season in which SAMI would be assuming responsibility for

16   harvesting Marlin's groves in central Arizona at White Wing, Eloy, and Maricopa.

17   Previously that part of Marlin's harvest had been accomplished by SAMCO.  Further, the

18   evidence is uncontested, that after the pre-harvest meeting at McDonalds, Richard De Leon

19   did arrange to meet with Jose Castano and did tell him that his crew would be employed out

20   of San Luis for the 06-07 harvest season.  Thus, the Court concludes that SAMI did not

21   determine to wholly abandon its operations out of San Luis until sometime after it had

22   offered employment to Jose Castano and his crew.  This  was, at the most, only a few weeks

23   before the harvest season began, and it was also after SAMI had submitted its application for

24   H-2A workers to the Department of Labor.  As a result, SAMI had not determined, when it

25   submitted its H-2A application, that it would not be hiring U.S. workers at the corralon at San

26   Luis, and the authorization it received to hire H-2A workers was not used as a ruse to

27   discriminate against the nine U.S. citizen Plaintiffs.

28        Plaintiffs also assert that Defendants' failure to comply with the fifty percent rule

demonstrates intent to discriminate.  The fifty percent rule requires an employer of H-2A workers to hire any U.S. worker who applies for employment being performed by H-2A workers anytime during the first half of the H-2A contract term.  After carefully listening to the testimony offered at trial, the Court cannot determine that any of the § 1981 Plaintiffs actually subsequently applied to Defendants for what would for them have been migratory agricultural work at White Wing.  Only two of the nine § 1981 Plaintiffs, Raul Garcia Almeida and Octavio Serrano, testified that they asked someone at SAMI to have their jobs back.  Not only does the Court not find their testimony credible, for the reasons stated above, but, asking to have back a job that was seasonal agricultural employment, is not the same thing as applying for a position as a migratory farm worker.

During the season at issue, the H-2A workers at White Wing received the same pay and benefits as had been offered to U.S. workers for that employment.  Nevertheless, Plaintiffs argue, SAMI was not required to pay the employer's tax for social security on H-2A workers that it was required to withhold and pay for U.S. workers.  The Court, however, does not, in this case, find this a credible basis on which to infer an intent to discriminate. SAMI was employed by Marlin on a cost-plus basis.  For the 06-07 harvest season Marlin payed SAMI its labor cost plus an overhead of 42.5%.  Therefore, to the extent that SAMI would have had to pay the employer's tax for social security for some or all of its employees, these amounts would have presumably been reimbursed, together with the 42.5% overhead to SAMI from Marlin.  It would not, therefore, have been cheaper for SAMI to employ H-2A workers. Even had the extra withholding caused the Marlin Defendants additional expense, Defendants have convinced the Court that the additional costs incurred in recruiting, transporting, housing and feeding the H-2A workers more than offset the additional expense incurred by the additional withholding.  There was, therefore, no sufficient motivation in the expense incurred in hiring the nine United States citizens as workers, to suppose that it was a motivation for discriminating against them.

In short, the Court finds that the § 1981 Plaintiffs have not met their burden of proof of establishing that Defendants intentionally discriminated against them due to their status

1   as United States Citizens.

2   **III.   AWPA Claims**

3   The AWPA sets forth remedial statutes designed to protect "seasonal agricultural

4   workers" and "migrant agricultural workers."  All parties acknowledge that Plaintiffs were

5   seasonal agricultural workers within the meaning of 29 U.S.C. § 1802(10)(A)."  The Court

6   will thus proceed with an AWPA analysis under the statutory protections for seasonal

7   agricultural workers set forth in 29 U.S.C. §§ 1831 and 1832 (2009).[5]   The AWPA

8   definitions for both "seasonal agricultural workers" and "migrant agricultural workers"

9   explicitly exclude H-2A workers.  29 U.S.C. § 1802(8)(B)(ii) & (10)(B)(iii) (2009).

10          **A.     Working Arrangements (29 U.S.C. § 1832(c))**

11  Pursuant to the requirements of 29 U.S.C. § 1832(c) "no farm labor contractor . . .

12  shall without justification, violate the terms of any working arrangement made by that

13  contractor . . . with any seasonal agricultural worker." Plaintiffs claim that Defendants have

14  violated the AWPA by violating working arrangements between the Defendants and the

15  Plaintiffs in four separate ways.

16          **1.     End of Season Statements.**

17  Plaintiffs first claim that Defendants created a "working arrangement" with Plaintiffs

18  that they would be employed for the 2006-07 harvest season by engaging in the custom or

19  _____

20          [5]Despite the stipulation in the pretrial order that Plaintiffs are "seasonal agricultural workers." Plaintiffs also appear to seek the statutory protections afforded to "migratory agricultural workers" under the statute.  Although separate subchapters apply to "seasonal agricultural workers" and "migrant agricultural workers" under the statute, the protections are, in most respects, identical.  Farm labor contractors are prohibited by the statute from violating, without justification, the terms of any "working arrangement made by [a farm labor] contractor, employer or association with any seasonal agricultural worker" or migrant agricultural worker. 29 U.S.C. §§ 1822(c) & 1832(c). The AWPA further prohibits any such employer from "providing false or misleading information" of a certain type to migrant or seasonal agricultural workers.  29 U.S.C. §§ 1821(f) & 1831(e).  Although there are some distinctions that apply as it pertains to the separate statutes protecting migrant farm workers from being provided with false or misleading information, they are not relevant to the Court's analysis in this case.  The analysis therefore, is the same regardless of whether either or both statutory protections are applied.

practice of having their supervisors or foremen state to Plaintiffs at the finish of their work during the 06-07 harvest that they "would see them again next year," or equivalent statements. Even assuming the truth of such testimony, such statements between Defendants and Plaintiffs fail to create a "working arrangement" protected by AWPA that would require the Defendants to rehire Plaintiffs as seasonal agricultural workers for the 06-07 harvest season.

As is apparently uncontested here, Marlin's available fields to harvest in the Yuma Valley declined from the 05-06 season to the 06-07 season. And the very nature of seasonal agricultural work is dependent upon a number of factors. To the extent that SAMI's foremen may have said something to their workers to the effect that they would see them again during the 06-07 harvest season, it cannot reasonably be interpreted as a "working arrangement" binding SAMI to give them employment as seasonal agricultural workers during the 06-07 harvest season. As Foreman Gonzalez testified, he did not understand this statement to be a promise by SAMI to employ him the next year, but he did expect that he would be able to work for SAMI again the following year. Such an expectation, however, does not give rise to a "working arrangement" enforceable under the statute.

Even were the Court to find that a working arrangement existed, it would not accept Plaintiffs claim that such "working arrangement" extended beyond the actual type of employment Defendants had previously offered to Plaintiffs. That is, Plaintiffs had previously been employed by SAMI as seasonal agricultural workers. They now assert that, under the AWPA, the assurance that SAMI would see them again next year means that SAMI bound itself to reserve migrant agricultural work for them, even when they had never been so employed by SAMI and even when they had failed to apply for the migrant agricultural work when it had been advertised in their community. Even if an enforceable working arrangement existed under these circumstances it would not extend so far.

## 2.    Letters Prior to Harvest Season

There was no custom and practice by which Defendants sent out letters to past employees prior to the beginning of a new harvest season to solicit their re-employment with

Defendants.  The evidence demonstrates that DES, but not SAMI, sent out letters to former

SAMCO workers prior to the beginning of the 04-05 season.  Defendants' failure, therefore,

to send out letters to its past seasonal agricultural workers advertising migrant farm worker

positions at White Wing did not violate any "working arrangement" it had with Plaintiffs.

### 3.   H-2A Regulations

Plaintiffs' base their H-2A argument on two separate premises.  First they claim that

Defendants did not comply with an H-2A regulation pertaining to the recruiting of U.S.

workers.   Second they assert that a few of the Plaintiffs asked to be re-employed by

Defendants and were not employed in violation of the fifty percent rule.

#### a.   H-2A Recruitment Regulations and Orders   (20 C.F.R. § 103(d)(3))

Defendants ran both radio and newspaper ads in the Yuma area designed to recruit

workers to their White Wing facility prior to recruiting H-2A workers.  Defendants also

coordinated with DES Job Service to recruit such U.S. workers.  Plaintiffs assert, however,

that Defendants failed to comply with 20 C.F.R. § 655.103(d)(3) which requires Defendants

to "cooperate with [DES] in the active recruitment of U.S. workers by . . . (3) Cooperating

with [DES] and independently contacting farm labor contractors, migrant workers, and other

potential workers in other areas of the State and/or Nation by letter and/or telephone."

The H-2A regulations allow the Department of Labor to give content to this otherwise

limitless obligation by providing notice in the clearance order "of the specific efforts which

will be expected from them during the following weeks to carry out the assurances contained

in § 655.103 with respect to the recruitment of U.S. workers." 20 C.F.R. § 655.105.  On June

27, 2006, the U.S. Department of Labor issued its clearance order in which it defined this

obligation as "contacting all former U.S. workers, soliciting their return to the job, and

documenting its attempts to do so."  Defendants stipulate that they personally contacted no

U.S. workers between then and the time that the Department of Labor approved their H-2A

application, and, as a result, they documented no such efforts.  The Department of Labor,

nevertheless, approved Defendants' H-2A application in sufficient time to allow Defendants

1    to recruit H-2A workers prior to the beginning of the 06-07 harvest season.

2          Instead of asking this Court to review the Department of Labor's determination that
3    the Defendants had adequately complied with their specific requirements for recruiting U.S.
4    workers, the Plaintiffs request that the Court deem those specific requirements as
5    incorporated into their "working arrangement" with the Plaintiffs under the AWPA as a
6    matter of law.    They then ask the Court to impose AWPA's statutory damages on the
7    Defendants for failing to qualify with the conditions imposed upon them by the Department
8    of Labor, even though the Department of Labor determined that Defendants had adequately
9    complied with their recruitment requirements.

10         Such a request is unworkable and unfair.  Plaintiffs provide this Court with no case
11   in which a court has incorporated H-2A requirements pertaining to the recruitment of U.S.
12   employees as part of the "working arrangements" between U.S. employees and their
13   employer protected under the AWPA.  To be sure for purposes of applying the AWPA's
14   protections, the "working arrangement" between agricultural workers and their employer
15   may include specific worker protections included in federal or state law.  These would
16   include laws that govern the employment relationship between the employee and the
17   employer, such as state laws specifying the wages that are due the employee.  Nevertheless,
18   an AWPA "working arrangement" generally constitutes only "the terms of employment
19   actually communicated between employer and employee." *Doe v. D.M. Camp & Sons*, 624
20   F. Supp. 2d 1153, 1172 (E.D. Cal. 2008). *See also Valenzuela v. Giumarra Vineyards Corp.,*
21   619 F. Supp. 2d 985, 990–91 (E.D. Cal. 2008).   "It does not automatically encompass any
22   and all statutes and regulations governing agricultural employment."*Valenzuela*, 619 F. Supp.
23   2d at 993.

24         The specific recruitment obligations at issue here are imposed by the certifying officer
25   on the employer as deemed necessary for compliance with 20 C.F.R. § 655.103(d)(3).  They
26   are not "terms of employment actually communicated between employer and employee."
27   *D.M. Camp & Sons*, 624 F. Supp. 2d. at 1172.  They do not impose a direct responsibility on
28   the employer with respect to any U.S. worker who is a Plaintiff in this action.  The regulatory

1    obligation to "independently contact[] farm labor contractors, migrant workers, and other

2    potential workers in other areas of the State and/or Nation by letter and/or telephone," 20

3    C.F.R. § 655.103(d)(3),  is designed to be interpreted by the Department of Labor with the

4    undefined regulatory requirement being adjusted to the specific circumstances of each case.

5    The regulations specify that it is up to the certifying officer to determine "the specific efforts

6    which will be expected from [the employer] during the [application period] to carry out the

7    assurances contained in § 655.103 with respect to the recruitment of U.S. workers."  20

8    C.F.R. § 655.105.  It is further up to the certifying officer to determine whether the employer

9    has complied with that obligation.

10       Thus the recruiting requirement which Plaintiff would have the Court incorporate into

11   the working arrangement was designed to be imposed by the certifying officer; its

12   requirements were to be interpreted and adjusted by the certifying officer; and the certifying

13   officer is the appropriate person mandated under the regulations to determine compliance.

14   Further, these considerations are to be evaluated in the context of the certifying officer

15   determining whether an H-2A certification should be granted to the employer.  These

16   recruitment regulations and others like them are not part of the "working arrangement"

17   between an employer and its employees.  To recognize it as such would contradict the

18   clearance order's purpose of defining the employer's obligation, would afford no deference

19   to the Department of Labor, which, according to the regulations themselves, is the

20   appropriate entity to decide the question, and would subject the Defendants to potentially

21   expensive and inconsistent determinations concerning their compliance with the recruitment

22   obligations imposed by the Department of Labor.

23       In cases like this one in which the employer has not previously hired migrant farm

24   workers at a particular location, it has no previous employees that can be efficiently recruited

25   to return to work.  And, nothing about the general regulation, or DES's implementation of

26   it in this case, afforded any specific obligation with respect to any of the Plaintiffs.

27       Further, to the extent a party obtains its certification through fraud or

28   misrepresentation, the H-2A regulations provide an administrative remedy through which

Plaintiffs could have pursued relief that would restrict, to varying degrees, the H-2A activities of the Defendant. 20 C.F.R. § 655.108 (2006). Plaintiff sought no such relief. It is, therefore, not appropriate in this instance to permit such relief by deeming the recruitment requirements of the H-2A program incorporated into the "working arrangement" protections of the AWPA.

Plaintiffs made no specific argument at trial, or in their pre or post-trial briefing, that the number of acres that the Department of Labor had authorized Defendants to harvest in the Yuma Valley with H-2A workers was incorporated into their working arrangement with Plaintiffs or otherwise enforceable by the AWPA. In the absence of such an argument or evidence,[6] the Court need not decide whether the AWPA would prevent Plaintiffs from exceeding those limits. The Court further notes that, at any rate, there is an administrative procedure provided as part of the H-2A regulations through which Plaintiffs may seek relief when Defendants fail to comply with the terms of the H-2A certification they have received from the Department of Labor, such as the number of acres Defendants could harvest with H-2A workers. 20 C.F.R. § 655.110 (2006) (indicating administrative procedure to follow when the certifying officer "has reason to believe that an employer violated a material term or condition of the H-2A certification"). Plaintiffs apparently pursued no such relief. In any

---

[6]In response to the Court's questions at trial, Mr. De Leon indicated that in the 06-07 harvest SAMI attempted to harvest all the available acreage in Yuma Valley that had been harvested by both SAMI and SAMCO in previous years. Nevertheless, William.Chaney testified that prior to the 06-07 harvest season, the Marlin entities had sold off and retired some of its citrus acreage in the Yuma Valley, and he further testified that other farm labor contractors such as Dominguez and Galindo & Galindo had to be hired to complete the 06-07 harvest in the Yuma Valley since SAMI could not do so. In their written arguments submitted in this matter, Defendants have asserted that they did not harvest any more acres in the Yuma Valley in the 06-07 harvest season than the 300 specific acres SAMI was authorized to harvest by the Department of Labor. Although Plaintiffs have submitted a number of exhibits from which the fields harvested by SAMI in the Yuma Valley that season could possibly have been determined, Plaintiffs have not introduced evidence interpreting the invoices or documents or otherwise suggesting that SAMI in fact harvested more than the 300 acres in Yuma Valley. Therefore, the Court cannot conclude based on the evidence submitted that the amount exceeded the 300 acres authorized by the Department of Labor.

1   event, in the absence of sufficient evidence for the Court to determine whether, in fact,

2   Defendants exceeded the authorized limit of their harvest in the Yuma Valley with H-2A

3   workers, the Court need not determine whether such terms could be incorporated into the

4   AWPA's protection of working arrangements between employer and employee.

5                   **c.      H-2A Fifty Percent Rule  (20 C.F.R. § 103(e))**

6              In contrast to the recruitment provisions and certification provisions, the fifty percent

7   rule imposes an affirmative and specific duty on an H-2A employer with respect to its U.S.

8   employees or prospective employees.  The fifty percent rule is not subject to interpretation

9   or adjustment by the Department of Labor, and it does not relate to the certification

10  determination that the Department of Labor must make in a very specific and time-sensitive

11  period.  It may, therefore, constitute part of the "working arrangement" between an H-2A

12  employer and a U.S. employee who applies for employment being performed by H-2A

13  workers during the first half of the contract period.  The fifty percent rule  provides that "the

14  employer . . . shall provide employment to any qualified eligible U.S. worker who applies

15  to the employer until 50% of the period of the work contract, under which the foreign worker

16  who is in the job was hired, has elapsed."  20 C.F.R. § 103(e).  The regulation further

17  provides that "the employer shall offer to provide housing and the other benefits, wages, and

18  working conditions required . . . to any such U.S. worker and shall not treat less favorably

19  than H-2A workers any U.S. worker referred or transferred pursuant to this assurance." *Id.*

20             The Court, however, has no need to determine the question in this case because

21  Plaintiffs, ultimately, have been unsuccessful in establishing at trial that any of them

22  subsequently applied for the White Wing employment.  As the Court has already observed,

23  it does not consider the testimony of Raul Garcia Almeida, Octavio Serrano, Pedro Lubiano-

24  Cisneros or Alejandro Duarte  to the effect that they asked to have their jobs back, credible.

25             Finally, Cornelio Nunez-Gonzalez testified that when he witnessed SAMI foremen

26  loading the H-2A workers on SAMI buses he approached his previous foreman, Leobardo

27  Aguirre, and asked to have his job back.  He testified that he was referred by Mr. Aguirre to

28  Richard De Leon, who indicated to him that SAMI would not be hiring workers from the

1   "San Luis" area this season.  Mr. Nunez testified that he was upset that SAMI was hiring

2   foreign workers to do the work he had done in the past.  Although Richard De Leon firmly

3   denied having such a conversation with Mr. Nunez-Gonzalez, the Court need not resolve that

4   conflict here to determine that the fifty percent rule was not invoked.

5       To invoke the fifty percent rule, an employee must apply to the employer for the

6   employment being performed by H-2A workers.  The questions posed by counsel to Mr.

7   Nunez-Gonzalez all made it clear that Mr. Nunez-Gonzalez testified that he asked Mr.

8   Aguirre and Mr. De Leon to have his job "back."  Nevertheless, for the reasons already

9   discussed at length, SAMI offered no jobs for "seasonal agricultural workers" out of the

10  corralons at San Luis during the 06-07 harvest season, which was the job that Mr. Nunez-

11  Gonzalez had held with SAMI.  To the extent that Mr. Nunez-Gonzales did ask to have his

12  job back, he was not asking to have employment at White Wing.  SAMI had, previous to the

13  commencement of the season, advertised and offered positions out of White Wing to workers

14  in the San Luis area.  None had applied for such employment which would have, for most

15  of them, been migratory farm work as opposed to seasonal agricultural work.  The White

16  Wing work was the work that had been accepted and was being performed by the H-2A

17  workers.  Based on his trial testimony, the Court concludes that Mr. Nunez-Gonzalez did not

18  apply for employment at White Wing.

19      Plaintiffs nevertheless allege that if and when any of the Plaintiffs did ask Defendants

20  for their jobs back, Defendants were under an obligation with respect to these Plaintiffs to

21  explain to them the terms of the employment that they were offering at White Wing.

22  However, the regulation imposes no such obligation.  It is true that had such application for

23  employment at White Wing been made, the regulation obliges Defendants to "provide

24  housing and the other benefits, wages, and working conditions . . . to any such U.S. worker

25  and shall not treat less favorably than H-2A workers any U.S. worker referred or transferred

26  pursuant to this assurance." 20 C.R.F. § 103(e).  But this regulation does not impose upon

27  Defendants the obligation to solicit applications from Plaintiffs for employment different

28  than that applied for by Plaintiffs in previous years.

**4.**     **Offer of Employment to Castano's Crew**

It is uncontested that just prior to the 06-07 harvest season Richard De Leon offered employment with SAMI to Jose Castano and his crew.  The Court further finds that when Mr. De Leon did so, he knew that Jose Castano would begin to recruit his crew, and that his crew would have a reasonable expectation of being employed by SAMI as seasonal agricultural workers out of the corralon at San Luis for the 06-07 harvest season.  Based on the evidence adduced at trial, however, the Court determines that when De Leon offered the seasonal agricultural employment to Castano and his crew, De Leon had not yet made the decision, and thus did not know, that SAMI would not be offering seasonal agricultural employment out of the corralons at San Luis.  Therefore, his offer was not in violation of those sections of the AWPA which prohibit ***knowingly*** providing false or misleading information to a migrant or seasonal agricultural worker "concerning the terms, conditions, or existence" of employment.  29 U.S.C. §§ 1821(f) & 1831(e).[7]

Nevertheless, the Court further finds that initiating such recruiting directly prior to the commencement of the harvest season at San Luis was part of the standard practice between SAMI and its San Luis-based crews.  SAMI engaged in this practice  to commit working crews to SAMI's employment during the upcoming harvest season.  When, after initiating the recruitment of Mr. Castano's crew, Defendants made the decision that they would not provide employment to Mr. Castano's crew or anybody else from the corralon at San Luis, they violated the "working arrangement" that they had undertaken with Mr. Castano's crew.  The Court further finds as a matter of fact that neither Mr. De Leon, nor anyone else at SAMI took adequate steps to inform Mr. Castano or his crew prior to the beginning of the season that SAMI would actually not be employing workers for that season from the San Luis corralon.  The Court further finds that, as a result, many of the members of Mr. Castano's

---

[7]To the extent that the Plaintiffs assert that the protections applicable to migrant agricultural workers apply, SAMI was, at this point, only recruiting Mr. Castano's crew for seasonal agricultural labor, and thus only those AWPA protections pertaining to seasonal agricultural workers are arguably applicable.

1    crew who had been recruited to work for SAMI for the 06-07 harvest season, were

2    unemployed for some period at the beginning of the harvest season while they sought work

3    with a different harvest employer.  As a result, Defendants, as joint employers, violated the

4    provisions of 29 U.S.C. § 1832(c).

5        This violation entitles those workers, that the Court finds were actually recruited, to

6    statutory damages authorized by 29 U.S.C. § 1854.  Plaintiffs seek an award of statutory

7    damages under the statute, and the statute authorizes the Court to award "up to $500 per

8    plaintiff per violation."  29 U.S.C. § 1854(c)(1) (2009).

9        The Court has reviewed the testimony of Mr. Castano and others at trial to identify

10   those Plaintiffs that Mr. Castano recruited for SAMI during the 06-07 harvest season.  The

11   Court has then compared the identified Plaintiffs with their work histories with SAMI to

12   assess (a) the likelihood that they were actually recruited by Mr. Castano to work for SAMI

13   for the 06-07 harvest season, (b) the likelihood that they suffered economic damages by

14   missing work they could have otherwise performed for SAMI while searching for work with

15   a different employer, (c) the pay that Plaintiffs would have received for work during the

16   period necessary to find other employment, and, (d), the lack of evidence that Plaintiffs made

17   an attempt to resolve the issues in dispute before the resort to litigation.  29 U.S.C.

18   § 1854(c)(2) (2009).

19       After conducting this analysis the Court awards the following amounts to the

20   following Plaintiffs.  The Court awards $500 in statutory damages to (1) Raul Garcia, (2)

21   Reynaldo Guerra Jimenez, (3) Fernando Duarte Ochoa, (4) Alberto Miranda Haros, (5)

22   Antonio Fuentes, (6) Francisco Duarte Rascon, (7) Guadualupe Espinoza, (8) Jorge Delgado,

23   (9) Juan Rodriguez Orosco, and (10) Raul Garcia Almeida.

24       The Court awards $250 to (1) Gustava Zerega Espinoza, (2) Carlos Manuel Palacios

25   Torres, (3) Rafael Beltran Nunez,  (4) Alfredo Avalos Barron, (5) Jesus Medina Uriarte, (6)

26   Jose Botillo Avila, (7) Pedro Angulo, (8) Saul Gonzales, (9) Marcos Amezcua, (10) Teodoro

27   Loya Carillo.

28       The Court awards $150 to (1) Javier Rendon Aguilera, (2) Francisco Cervantes Gil,

1  (3) Aurelio Quinonez Armenta, (4) Graciela Reyes Medina, (5) Jesus Antonio Penunuri, (6)

2  Jose Contreras, (7) Jose Sepulveda, and (8) Trinidad Medina.

3         Although there was testimony that the following Plaintiffs were recruited by Jose

4  Castano, the Court finds in light of their past employment with SAMI either that it is not

5  credible that they were recruited by Mr. Castano, or that in equity, they did not suffer any

6  loss in transitioning from SAMI to another employer in the 06-07 harvest season:  (1)

7  Alejandro Duarte, (2) Jose Valdez, (3) Mario Castro, (4) Octavio Serrano, and (5) Sergio

8  Amescua.

9         No other Plaintiffs are awarded relief on any of their other claims.

10         A form Judgment Order shall be lodged with the Clerk of the Court **within fourteen**

11  **(14) days** of the date of this Order.

12         DATED this 27th day of March, 2012.

13

14                              G. Murray Snow

15                           United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28